IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 4, 2009

## STATE OF TENNESSEE v. NATHANIEL BANKS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-03482     Carolyn Wade Blackett, Judge**

---

**No. W2008-02202-CCA-R3-CD  - Filed December 8, 2009**

---

A Shelby County jury convicted the defendant, Nathaniel Banks, of two counts of aggravated sexual battery. The trial court sentenced him as a Range II, multiple offender, to fifteen years in the Tennessee Department of Correction at one hundred percent. On appeal, he presents two issues for review: (1) whether the evidence was sufficient to support his convictions; and (2) whether the trial court erred in sentencing him as a Range II offender. Following our review of the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Robert Wilson Jones, Chief Public Defender (at trial and on appeal), Michael J. Johnson (on appeal), and Tom Pera (at trial) Assistant Public Defenders, Memphis, Tennessee, for the appellant, Nathaniel Banks.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stacey McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Background

The Shelby County Grand Jury indicted the defendant on two counts of aggravated rape. The following evidence was presented at trial. The victim testified that in December, 2002, she was home alone when the defendant called and asked her to "boost off" his car. She stated that the defendant had never called her before that morning. As she was walking out her front door, a man wielding a large butcher knife forced her back inside her apartment. The victim stated that he was wearing all black, had a black stocking cap covering his face, wore latex gloves, and had on red tennis shoes. She did not know who the man was but testified that he was similar in size to the

defendant. She grabbed the knife, and the blade broke apart from the handle. The man forced her onto the floor and pulled her coat over her head, then tied her wrists with the cord of a VCR and her ankles with the cord of an iron. He proceeded to remove her pants and underwear. She heard his "zipper go down" and then [f]elt his penis go into [her] vagina.". The victim testified that he was inside of her for "five to [ten] minutes" and that it hurt her. She could not tell whether the man used a condom or whether he ejaculated. She testified that he told her that "he had stabbed somebody and the police was [sic] looking for him[,]" but he disguised his voice when he spoke.

The victim testified that the man left her tied up when he was finished. She said that "he tried it again[,]" but she kicked him. He then punched her in the face several times. She testified that he "tried to wash [her] up" with a towel. He also spread washing powder and bleach over the carpet, then vacuumed the area. She said that he then started going back and forth between the kitchen and the balcony window. While he was looking out of the window, she asked him, "was [sic] they gone yet[,]" and he replied that they were not. After about ten minutes, he left. She was able to untie herself, and then she called her mother and the police.

The victim testified that before the police arrived, the defendant knocked on her door. She let him into the apartment, and he immediately picked up the VCR and iron. He then went to the kitchen and washed his hands, telling the victim that he was "washing his hands for fingerprints." When the police arrived, the defendant was present when she talked to them about what happened. The police called an ambulance for her. She went to a hospital, where they examined her face. She then went to the Rape Crisis Center, where they took her pants and underwear and swabbed between her legs. After her examination, she gave a statement at the police department.

The victim testified that the defendant had been her sister's boyfriend for four years and visited her sister "every day." She stated that she recognized the shoes that her attacker was wearing as being "just like" her sister's shoes and that the defendant had a pair also.

Sergeant John Henry Williams, Jr. of the Memphis Police Department testified that he was the first to the scene on December 19, 2002. He identified the defendant as the man who answered the victim's door that day. He said that the victim was sitting on the couch, and he asked her if she needed medical attention for the bruise on her head. She did not speak until after his partner arrived, but she would look at the defendant when Sergeant Williams asked her questions. He testified that he believed she would speak to his partner if he took the defendant outside. When he took the defendant outside, he saw the defendant's vehicle and looked inside of its window. Sergeant Williams testified that he saw a bloody rag in the front area of the vehicle and a package of latex gloves on the back floorboard. He said he could recognize blood when he saw it because of his experience on the police force.

Sergeant Williams recalled that the defendant was wearing dark pants when he first saw him and "had a black stocking cap on his head." He testified that he saw a cut with fresh blood on the defendant's hand that could have been caused by a knife. He also saw blood on the defendant's leg.

On cross-examination, Sergeant Williams testified that he had lifted the defendant's pants leg up to see where the blood on his leg originated. He said that he could not recall his testimony at the preliminary hearing that the defendant wore black and red pants on December 19, 2002. He said that whether it was normal for a man to be wearing a hat in December depended on the temperature, and he could not remember what the temperature was on December 19. He could not recall whether he found a knife at the scene, the address of the scene, or the victim's name.

On redirect examination, Sergeant Williams testified that a photograph of the defendant taken the day of the incident shows the defendant wearing "black sweats with the red shoes and a red sport's [sic] shirt on."

Sergeant Wanda Benton of the Memphis Police Department testified that on December 19, 2002 she responded to a call at 4390 Andorra Road. When she arrived, Sergeant Williams was present along with the defendant and the victim. Sergeant Benton testified that the victim was "reluctant to give information." She said that home appliance cords were used in the assault and that faded spots were on the carpet, which might have been caused by bleach.

Officer Patricia Kay Turnmire testified that she was with the Memphis Police Department Crime Scene Unit in December of 2002. She photographed the scene at 4390 Andorra Road. She testified that she tagged a VCR found at the scene as evidence, as well as an iron that had blood spatters on it. She said that she recognized blood from her experience on the job. On cross-examination, Officer Turnmire testified that she did not perform the test for blood. When recalled by the state, Officer Turnmire identified a photograph of the victim taken at Delta Medical Center showing the victim's ankles that she took between thirty and forty-five minutes after responding to the crime scene. She also identified a photograph of the defendant's 1995 Cutlass Supreme parked in front of the victim's apartment and which was taken as evidence in the case.

Hyun Kim testified that he worked for the Memphis Sexual Assault Resource Center as a forensic scientist. He said that on January 9, 2003, he transported a box containing the victim's rape kit, a blood sample from the victim, and a blood sample from the defendant to the TBI crime lab in Shelby County.

Officer Donald Flynn of the Memphis Police Department testified that he was a criminal investigator for the District Attorney General's office in 2005. He stated that on May 20, 2005, he took a sealed bag from the property room at the Shelby County Criminal Justice Complex and transferred it to the TBI Crime Lab. On cross-examination, he testified that he knew the evidence bag in the court room was the same as the bag he transferred in 2005 because of the bar code on the bag.

Sergeant Wyley Taylor of the Memphis Police Department testified that he prepared an Advice of Rights document for the defendant in December, 2002. Sergeant Taylor testified that the document showed that the defendant agreed to give samples of blood, hair, and saliva. Sergeant Taylor, Sergeant Taylor's co-worker, and the defendant each signed the document. On cross-examination, Sergeant Taylor testified that he did not have anything to do with the investigation of the case.

Special Agent Donna Nelson testified that she is a serologist and DNA analyst with the TBI. She stated that she analyzed a vaginal swab taken from the victim and found the presence of spermatozoa. She determined that there was a mixture of DNA material on the vaginal swab, with the victim being the major contributor of DNA and the defendant being the minor contributor of DNA. Special Agent Nelson testified that "the probability of that minor contributor being someone other than a related individual, exceeds the current world population." She further testified that she found blood on the iron taken from the victim's apartment. She stated that "a partial profile was obtained that matched [the defendant] at [eleven] out of [thirteen] areas in the gender marker" and that the probability of anyone else having the same DNA profiled "exceeds the current world population."

On cross-examination, Special Agent Nelson said that she obtained a partial profile from the iron because there was not enough DNA present for a full profile from the beginning of the analysis process. She testified that she used a computer program from the FBI to generate the probability of another person's DNA matching the profile she obtained from the evidence. She also testified that she is unable to tell how long spermatozoa or blood has been on a surface.

Elizabeth Thomas testified that she was a Sexual Assault Nurse Examiner at the Memphis Sexual Assault Resource Center who examined the victim the same day of the attack. She said that the victim told her an unknown black male had assaulted her around nine o'clock that morning and had forced vaginal penetration. Ms. Thomas testified that she took urine and blood samples from the victim and performed a pelvic examination. She did not observe injuries to the victim's genitalia. Ms. Thomas testified that it was common for adult victims to not display injuries after a sexual assault. She observed injuries to the victim's face, and she testified that the photographs that the state presented fairly and accurately showed what she observed. Ms. Thomas further testified that the victim complained of a headache and facial pain. She stated that she collected a vaginal swab from the victim as evidence. Ms. Thomas said that during the examination, the victim "was tearful at some times and very, very, quiet and tense at other times." Ms. Thomas testified that she also collected blood, saliva, and hair samples from the defendant. On recross-examination, Ms. Thomas testified that she did not observe any injuries to the victim's ankles at the time of the examination.

Based on the evidence presented, the jury found the defendant guilty of two counts of the lesser included offense of aggravated sexual battery. The trial court merged the two convictions and sentenced the defendant as a Range II, multiple offender. The defendant received a sentence of fifteen years in the Tennessee Department of Correction at 100 percent and community supervision for life following sentence expiration, pursuant to Tennessee Code Annotated section 39-13-524.

**Analysis**
I. Sufficiency of the Evidence

On appeal, the defendant first challenges the sufficiency of the convicting evidence. Specifically, the defendant submits that the state did not prove that the defendant was the person who committed the offense beyond a reasonable doubt.

-4-

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003).

Relevant to this case, aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act, and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;

(2) The defendant causes bodily injury to the victim[.]

Tenn. Code Ann. § 39-13-504(a) (2006). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* at (2).

In this case, we conclude that the evidence is sufficient to support the defendant's convictions. Taken in the light most favorable to the state, the evidence establishes that an assailant met the victim at the door to her apartment with a large knife, forced her back into the apartment, and tied her up with electrical cords. The assailant removed her pants and forced his penis into her vagina. He punched the victim repeatedly in the face. The victim was not able to identify the defendant as her assailant. However, she testified that her assailant and the defendant were of the same size and were wearing the same type of clothing, but her assailant covered his face with a stocking cap and disguised his voice. Spermatozoa found in the victim's vagina and blood located on an iron both contained the defendant's DNA, and the probability that anyone else had the same

DNA profile exceeded the world's population. Accordingly, based on the evidence presented, we conclude that the jury could find the defendant guilty of aggravated sexual battery.

## II. Sentencing

The defendant contends that the trial court erred in sentencing him as a Range II, multiple offender, because the state did not properly notify the defendant that the state would seek enhanced punishment. Specifically, the defendant submits that the notice was not timely and was deficient because it did not list all of the defendant's convictions.

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate the defendant bears the burden of establishing that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Comments. When the trial court follows the statutory sentencing procedure and gives due consideration and proper weight to the factors and principles relevant to sentencing, this court may not disturb the sentence. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Upon review, we note that Tennessee Code Annotated section 40-35-202(a) provides that "[i]f the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial." *See also* Tenn. R. Crim. P. 12.3. If notice is filed late or is filed timely but is *otherwise defective,* the defendant must show prejudice before the notice will be rendered ineffective. *See State v. Carter,* 121 S.W.3d 579, 585 (Tenn. 2003) (citing *State v. Stephenson,* 752 S.W.2d 80, 81 (Tenn.1988)); *State v. Debro,* 787 S.W.2d 932, 933-34 (Tenn. Crim. App. 1989). The purposes of the notice requirement are satisfied when the defendant is not misled or surprised by the state's decision to seek enhanced sentencing. *State v. Chase,* 873 S.W.2d 7, 9 (Tenn. Crim. App. 1993).

The trial court found that the defendant should be sentenced as a Range II offender because he had "a minimum of two but not more than four prior felony convictions within the conviction class. . . ." The trial court based its finding on the defendant's presentence report. The trial court further found that the state's notice that it intended to seek enhanced punishment was "timely and appropriate. . . ." The state filed the original notice to seek enhanced punishment in April 2005. The notice stated that "the defendant may be sentenced as a Multiple Offender . . . as applicable" and listed one Class E felony. In 2007, the state gave the defendant notice that he could be sentenced as a Range II, multiple offender, but the notice did not list any convictions.

First, the defendant argues that the notice was not timely. He points to the fact that a clerk stamped the original notice as filed on the day of the sentencing hearing, August 8, 2008. However, the notice is accompanied by a certificate of service dated April 27, 2007 and signed by the state's representative. The trial court found that the notice was timely and appropriate. Furthermore, the trial court determined that the state could amend the notice prior to the sentencing hearing. The defendant incorrectly states that trial counsel said he did not receive the amended notice until the day

of the sentencing hearing. The transcript reveals that trial counsel stated he did not receive an *amended order* from the trial court until the day of the sentencing hearing. Also, the amended notice from the state is accompanied by a certificate of service dated September 13, 2007. Nothing in the record preponderates against the trial court's determinations. Additionally, the defendant has not shown that he was prejudiced by the timing of the state's notice. *See State v. Carter*, 121 S.W.3d 579, 585 (Tenn. 2003) (citing *State v. Stephenson,* 752 S.W.2d 80, 81 (Tenn.1988)). Accordingly, the defendant is not entitled to relief on this issue.

Secondly, the defendant submits that the notice was deficient because the original notice listed one Class E felony, and the amended notice did not include any convictions. The defendant argues that the original notice unambiguously notified the defendant that he was a Range I, standard offender. The state is required to "set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions." Tenn. Code Ann. § 40-35-202(a). When the state has "substantially complied" with the notice requirement, it is the defendant's "duty to inquire about an ambiguous or incomplete notice." *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990). Additionally, the defendant must show that the deficient notice prejudiced him. *Id.* In this matter, the original notice stated that the defendant could be sentenced as a Range II offender, and the amended notice made it clear that the state sought enhanced punishment of the defendant as a Range II offender. The trial court found that the notice was sufficient, and the defendant has not shown that he was prejudiced by the deficient notice. As such, the defendant is not entitled to relief on this issue.

## Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

———————————————————————
J.C. McLIN, JUDGE